**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

Case No. 11-MC-20429-GOODMAN

*In re* **the Extradition of Eddy Bismarck Nunez-Garrido**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**EDDY BISMARCK NUNEZ-GARRIDO,**

      **Defendant.**

_____/

**CERTIFICATION OF EXTRADITABILITY AND ORDER OF**

**COMMITMENT (WITH INCORPORATED MEMORANDUM OPINION)**

The United States of America, acting on behalf of the Government of the Dominican Republic, submitted a request for an order certifying the extraditability of Eddy Bismarck Nunez-Garrido ("Nunez") (also "fugitive" or "defendant") on the charge of homicide. For the reasons stated below, this Court **GRANTS** the request. The required judicial findings are incorporated in this memorandum opinion. This memorandum opinion explains the basis for the Court's findings and addresses some additional issues which arose during the extradition hearing and the related briefing.

## I.      PROCEDURAL BACKGROUND

The Court received a Complaint in this matter on February 7, 2011, filed by Amit Agarwal, Assistant United States Attorney for the Southern District of Florida, acting on behalf of the Government of the Dominican Republic, pursuant to the Dominican Republic's request for the extradition of Eddy Bismarck Nunez-Garrido.

On August 22, 23, and 24, 2011, the Court conducted an extradition hearing, where the authenticated documents submitted by the Government of the Dominican Republic were received in evidence.  The defendant appeared with counsel and was permitted to present testimony from two witnesses.  In particular, the defendant's cousin testified that he was present at the time of the shooting and believes that the fugitive shot the victim by accident.  The fugitive also presented testimony from an expert witness, Dr. Ronald Wright, who expressed certain concerns regarding some of the conclusions set out in the autopsy report authored by two forensic pathologists and included in the Government's extradition request.

The Court has carefully reviewed the evidence, including the declarations of various attorneys in the Office of the Legal Adviser, Department of State, and had the opportunity to observe the defendant's physical characteristics as compared with the evidence of identification before the Court.

Based on that review, the Court **FINDS** that:

1.  the Undersigned judicial officer is authorized under Title 18, United States Code, Section 3184, to conduct an extradition hearing [defendant does not contest this];

2.  the Court has personal jurisdiction over the defendant and subject matter jurisdiction over the case [defendant does not contest this];

3.  there is currently in force an extradition treaty between the United States and the Dominican Republic [the defendant does not contest this].  7 Bevans 200, 1909 U.S.T. LEXIS 50;

4.  the defendant was charged in the requesting state with homicide, was convicted *in absentia* of that offense, and was sentenced to a term of 20 years imprisonment [the defendant does not contest this];

5.  homicide is an extraditable offense within the meaning of Article II, paragraph 1 of the extradition treaty [defendant does not contest this];

6.  the requesting state seeks the extradition of the defendant for the offense of homicide [the defendant does not contest this either];

7.  the issue of probable cause is the only issue defendant challenges in this extradition proceeding; and

8.  based on the evidence submitted by the requesting country and presented by the United States, and for the reasons set forth below in this incorporated Memorandum Opinion, the Court finds there is probable cause to believe that Eddy Bismarck Nunez-Garrido, the fugitive and the same person who was brought before this Court, committed the offense for which his extradition is sought.

Based on the foregoing findings, the Court **CONCLUDES** that **Eddy Bismarck Nunez-Garrido** is **EXTRADITABLE** for the offense for which extradition is requested, and hereby **CERTIFIES** this finding to the Secretary of State as required under Title 18, United States Code, Section 3184.

## II.     OVERVIEW OF RELEVANT EXTRADITION LAW

As outlined below, the scope of this Court's authority and discretion is critical to assessing the Government's extradition request.

Nunez has mounted what is, in effect, a defense which seeks to challenge the merits of the homicide charge.  While appropriate for a federal criminal jury trial in this country, this type of defense and the points it urges are inappropriate for an extradition proceeding.

There is little dispute about the nature of Nunez's challenge.  He contends that the charge is incorrect and that the fatal shooting was purely accidental.  He argues the autopsy was

deficient and the conclusions of the two forensic pathologists, who performed the autopsy and concluded that the cause of death was homicide, are unreliable.  He introduced testimony from a well-known and reliable expert in forensic pathology who testified at the extradition hearing, former Broward County chief medical examiner Dr. Ronald Wright.

By his own admission, Nunez is seeking to have this Court **weigh the testimony** of the witnesses and **determine which witnesses are more credible**.  The following arguments, from Nunez's proposed order denying certificate of extraditability (DE# 74-1), establish the nature of Nunez's position:

"Dr. Wright's Opinions Which **Contest** Critical Conclusions in the Velez/Paez Autopsy Report."  (p. 14, section title) (emphasis added).

"Dr. Wright strongly **disagreed** with this conclusion [i.e., that the cause of death was homicide]."  (p. 15) (emphasis added).

The assertion that Nunez threw three rocks at the victim in the Jacuzzi "was **contested** by Emil."  (p. 17) (emphasis added).

"Julio Cesar denied that he had anything to drink" but that denial "is **contradicted** by Emil's testimony."  (p. 17, n. 14) (emphasis supplied).

"**As between the conclusions drawn and cause of death determination by the Velez/Paez autopsy report and the live testimony of Dr. Wright, this Court <u>gives more weight and credibility</u> to the opinions and conclusions of Dr. Wright that the cause of death here is really undetermined.**" (p. 22) (emphasis added).

Nunez also faults the United States and the Dominican Republic for not arranging to have the two forensic pathologists appear as live witnesses at the extradition hearing.  He also takes issue with the timing of the autopsy.

In sum, <u>all</u> of these arguments seek to rebut or challenge the evidence – a strategy *unavailable* in an extradition hearing.  Nunez's arguments might be persuasive at a jury trial but cannot be considered at an extradition hearing.  To demonstrate why these arguments are inappropriate, the Court will first outline the parameters of an extradition hearing and explain the rules which govern extradition hearings.

Pursuant to Section 3184 of Title 18, United States Code, the Executive Branch remains primarily responsible for extradition.  *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 828-29 (11th Cir. 1993).  The extradition judge is assigned the limited duty of determining the sufficiency of the request under the applicable treaty provisions.  *Id.* at 828.  This limited judicial function is carried out by conducting the hearing pursuant to 18 U.S.C. § 3184, determining whether the accused is subject to extradition, and, if so, certifying this to the Secretary of State.

Because of the circumscribed nature of an extradition proceeding, the importance of international obligations and the inherent practical difficulties in international proceedings, a defendant's right to challenge the evidence against him at an extradition hearing is limited.  *In re Extradition of Harusha*, No. 07-x-51072, 2008 WL 1701428, at *4 (E.D. Mich. Apr. 9, 2008); *see also In re Extradition of Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006) (right to challenge evidence is "quite limited").  *But cf. Martin*, 993 F.2d at 829 (noting that even under these constraints the "[t]he constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations").

After a judge issues a certificate of extraditability, "[t]he larger assessment of extradition and its consequences is committed to the Secretary of State."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).  The statute's "bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as

questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy which are better answered by the executive branch." *Id.* at 110; *see also Martin*, 993 F.2d at 829 ("The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not").

Framed by this broad discretion, the Secretary is not *required* to extradite the fugitive named in a certificate of extraditability.  She may, in the exercise of her discretion, *decline* to do so.  *See* 18 U.S.C. § 3186 (Secretary "may" order the fugitive to be delivered to the requesting country); *Lo Duca v. United States*, 93 F.3d 1100, 1103-1104 (2d Cir. 1996) ("Pursuant to its authority to conduct foreign affairs, the Executive Branch retains plenary discretion to refuse extradition").

Although Nunez agrees in his post-hearing memorandum that the sole issue is probable cause, his arguments go beyond the contours of a probable cause hearing and morph into jury-type arguments more appropriately made at a trial.  This approach is incorrect because "extradition hearings under § 3184 are in the nature of a preliminary hearing."  *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (quoting *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004)).  Accordingly, the "magistrate does not inquire into the guilt or innocence of the accused."  *Id.*  Instead, he looks only to see if there is evidence sufficient to show probable cause.  *Id.* (internal quotation marks omitted); *accord Kastnerova*, 365 F.3d at 987.

"The existence of probable cause" means "the existence of *a reasonable ground* to believe the accused guilty of the crime charged."  *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971) (emphasis added); *see also Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The

function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction").  "Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."  *Fernandez v. Phillips,* 268 U.S. 311, 311 (1925); *accord Escobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980).

Although Nunez argues that the Dominican Republic and/or the United States should have arranged for live witness testimony at the extradition hearing, this approach is not supported by the relevant case law authority.

In fact, an extradition hearing is even *more* limited in scope than a preliminary hearing. For example, cross examination of government witnesses is improper.  *Charlton v. Kelly*, 229 U.S. 447, 462 (1913) ("'[T]he cross-examination of the witnesses for the prosecution is certainly improper'") (quoting *United States v. White*, 28 F. Cas. 588 (1807)); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) ("As in the case of a grand jury proceeding, a defendant has no right to cross-examine witnesses or introduce evidence to rebut that of the prosecutor"); *accord In re Extradition of Romeo*, No. 87–0808RC, 1987 WL 10373, at *2 (D. Mass. May 1, 1987); *In re Surrender of Ntakirutimana*, No. CIV. A. L–98–43, 1998 WL 655708, at *30 (S.D. Tex. Aug. 6, 1998) ("**The cases are absolutely clear that cross-examination of [the Government's witnesses is not allowed in extradition proceedings**") (emphasis added), *aff'd*, 184 F.3d 419 (5th Cir. 1999); *In re Extradition of Powell*, 4 F. Supp. 2d 945, 958, 960 (S.D. Cal. 1998) (denying an accused's request to present evidence regarding the unreliability of the government's evidence and a duress defense, because "[r]ebuttal, presentation of contradictory evidence, and examination or cross examination of witnesses are not appropriate in this setting," and allowing

presentation of such evidence would amount to an impermissible "minitrial").

As noted above, Nunez has expressly conceded that his evidence is intended to **contradict** or challenge otherwise competent evidence in support of the Government's submission.  His counsel's comments at the hearing and his argument in the post-hearing briefing unequivocally demonstrate this.  (*See, e.g.*, Hr'g Tr. Vol. II, DE# 70, p. 88 ("[W]hat we have in this case is a version of facts submitted by the government.  We have ***a challenge to some of those facts presented by the defendant,*** and then we have the presentation of some facts on the defendant's part which this Court has permitted and allowed"); *see also* Hr'g Tr. Vol. II, DE# 69, p. 54) (Nunez's counsel follows up on Dr. Wright's testimony that a gunshot wound to the back of the head constitutes competent evidence of intent by asking:  "Where an eyewitness saw the shooting and said it was accidental, would that *neutralize* . . . any indicia that a shooting behind the head was intentional?") (emphasis supplied)).

The Court **FINDS** that the testimony offered by Nunez's witnesses and the documentary evidence Nunez asks this Court to consider constitute impermissible contradictory evidence, not permissible explanatory evidence.  *See, e.g.*, *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962) ("The accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal"); *accord Hoxha*, 465 F.3d at 561; *In re Extradition of Ramos-Herrera*, 268 F. Supp. 2d 688, 696 (W.D. Tex. 2003).

Although the Court will later in this Opinion explain its conclusion on a witness-by-witness basis, it is helpful to first address several of Nunez's arguments concerning the types of evidence which he contends this Court should consider:

*First*, Nunez contends that the Court has already decided that his evidence should be *considered* merely by allowing him to *present* that evidence at the hearing.  (*See, e.g.*, Hr'g Tr. Vol. III, DE# 70, p. 88 ("we have the presentation of some facts on the defendant's part which this court has permitted and allowed")).  That is not the Court's position, however.

Repeatedly during the extradition hearing itself, the Court cautioned that it was reserving judgment on *whether* the evidence it allowed Nunez to present would be deemed relevant in its ultimate decision-making process.  (*See, e.g.*, Hr'g Tr. Vol. I, DE# 68, pp. 35, 76 ("I understand the government's position and I will be able *later on* to determine what weight *if any* to give" to certain evidence; acknowledging that the Government had "a very significant argument and position to take as to most, if not all, of these exhibits because in the government's view they are beyond the scope of this particular extradition hearing," and noting that evidence allowed to be introduced "may or may not have any relevance later to this proceeding") (emphases added)).

As the Government itself recognized, one virtue of the Court's approach in giving wide latitude to the fugitive as to his *presentation* of evidence is that the Court is now in a very good position to assess whether the evidence Nunez was allowed to put on is in fact explanatory or contradictory within the meaning of the case law.  (*See* Hr'g Tr. Vol. III, DE# 70, p. 33).  Moreover, such an approach is not without precedent.  *See, e.g.*, *In re Extradition of Necolaiciuc*, No. 2:09-mc-21-FtM-DNF, 2011 WL 798144, at *10 (M.D. Fla. 2011) ("The Court allowed Necolaiciuc wide latitude in presenting evidence in this case. The Court will summarize the

evidence presented, however, in rendering its decision, the Court only considered the evidence that **explained rather than contradicted** Romania's proof") (emphasis added).

*Second*, Nunez does not cite any authority, controlling or otherwise, in which a court has held that evidence of the kind at issue here -- most importantly, evidence *challenging* the results of the autopsy conducted by two expert forensic pathologists, and testimony that seeks to *contradict* another person's depiction of events that transpired shortly before the shooting -- may be considered by a magistrate judge presented with an extradition request.  Extradition courts permit the defendant to offer explanatory evidence, not contradictory evidence, because the intention is "to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and having some reasonable chance of **negating** a showing of probable cause."  *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (emphasis supplied) (noting that "the decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits").

*Third*, Nunez does not cite, and the Court has not found, any case in which such evidence would be appropriate in a domestic preliminary hearing or a grand jury proceeding, the closest analogues to an extradition proceeding.

*Fourth*, Nunez suggests that, notwithstanding the well-established law holding that contradictory evidence should not be considered in an extradition proceeding, those cases cannot mean what they say because Congress by statute has decided to give the fugitive a right to a judicial hearing.  (*See, e.g.*, Hr'g Tr. Vol. III, DE# 70, p. 87).  That suggestion is unpersuasive. The issue is not whether Nunez has a right to a hearing; it is whether the evidence he seeks to admit to contradict or undermine the Government's proof falls within the scope of the hearing allowed by statute.  Likewise, the issue is not whether the hearing itself is rendered meaningless

if Nunez is not permitted to have his defenses to criminal liability fully litigated at the probable cause stage. For example, the hearing still allows Nunez to claim that the crime charged is not covered by a valid extradition treaty, that he is not the person sought by the requesting state, or even to present *explanatory* evidence concerning probable cause, permitted by applicable case law. *See Collins*, 259 U.S. at 315-17.

Regardless of whether it is described as contradictory evidence or evidence seeking to negate the requisite intent, Nunez's evidence is beyond the scope of an extradition hearing. *See generally* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §476 cmt. b (1987) ("**Evidence going to the merits of the charge, including . . . lack of criminal intent, ordinarily is not admitted in an extradition hearing, on the ground that guilt or innocence is most suitably determined by a court of the state whose law is alleged to have been violated**") (emphasis supplied).

In his post-hearing memorandum, Nunez argues that probable cause is "having more evidence for than against." (DE# 74-1, p. 16).[1] But probable cause does *not* mean "having more evidence for than against." As the Supreme Court has explained, "probable cause requires only a probability *or substantial chance* of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) (emphasis added); *accord Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (probable cause does not require an officer's suspicion to be "more likely true than false"); *Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980) ("probable cause" means "the

---

[1]     Specifically, on page 16 of his post-hearing submission, Nunez cites the 5th Edition of Black's Law Dictionary for the proposition that "probable cause is reasonable cause; having more evidence for than against . . . ." But that is a significantly outdated source. The *current* version of Black's Law Dictionary, the 9th, does not expressly or implicitly contain such language in its probable cause definition. In fact, the language Nunez cites disappears from the Black's Law Dictionary definition of probable cause in the Seventh Edition, which was released in <u>1999</u>. The most current version of the dictionary, the 9th edition, was published in 2009.

11

existence of **a reasonable ground** to believe the accused guilty") (internal quotation marks omitted; emphasis supplied).  "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision."  *Gates*, 462 U.S. at 235; (*see also* DE# 32 at 5-7 (citing cases)).

Substantial evidence of criminal intent need not be adduced to establish probable cause. Indeed, the Eleventh Circuit has held that, in at least some contexts, probable cause that a person has committed a crime *requiring proof of intent* may exist absent *any* evidence of criminal intent other than the suspect's commission of the underlying prohibited conduct.  *See, e.g.*, *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) ("While intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause to arrest"); *accord Jordan v. Mosley*, 487 F.3d 1350, 1356 (11th Cir. 2007) (this "Circuit has concluded that, even for a criminal statute that requires proof of an intent to defraud *for a conviction*, an arresting officer does not need evidence of the intent for probable cause to arrest to exist") (emphasis added); *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002) ("That the officers had no specific evidence as to this element, such as would convict Dahl at trial, did not prevent them from having probable cause to make the arrest") (citing *Adams v. Williams*, 407 U.S. 143, 149 (1972) ("**[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction**") (emphasis added)); *Harrell v. United States*, 875 F.2d 828, 831 (11th Cir. 1989) ("We find that plaintiffs' possession of the marijuana provided sufficient probable cause to arrest, without requiring Lt. Atkin to investigate further to determine actual criminal intent"); *see also Finigan v. Marshall*, 574 F.3d 57, 63 (2d Cir. 2009); *McGuire v. City of New York*, 142 F. App'x 1, 3 (2d Cir. 2005) ("[W]hen an officer has evidence that a defendant has engaged in conduct proscribed by law-whether transporting a quantity of

12

drugs, possessing a stolen item, or driving with a suspended license-he has probable cause to arrest the person even without specific evidence on the elements of knowledge and intent that will have to be proved to secure a conviction at trial").  While none of those cases addresses the extradition of a fugitive on a homicide charge, the underlying logic of those decisions applies equally here.

Assuming, *arguendo*, that some *specific* evidence of intent (i.e., evidence other than the fact that the defendant pulled the trigger of the gun and thus caused the firing of the fatal bullet which killed the victim) is required to establish probable cause for purposes of this hearing, evidence of criminal intent may often be inferred from the defendant's participation in the underlying proscribed conduct.  Where the defendant's conduct does not necessarily speak for itself (or where the defendant does not freely confess to his guilty state of mind), assessing intent involves a fact-intensive inquiry and will often rest on delicate credibility judgments requiring first-hand observation of the tone and demeanor of *all* the relevant witnesses.

In other words, assessing criminal intent generally involves the exact kind of inquiry that the trier of fact is charged with conducting in a trial-type proceeding -- the precise type of inquiry that is neither allowable nor practicable at the preliminary hearing stage.  *See Charlton*, 229 U.S. at 461-62.  That is particularly so in the context of an extradition hearing, where the relevant witnesses will generally be unavailable.  *See generally Freedman v. United States*, 437 F. Supp. 1252, 1267 (N.D. Ga. 1977) (agreeing with the extraditee that the record evidence "is not overly convincing of petitioner's guilt and complicity" and noting that the alleged coconspirators were acquitted in a case involving fraud-related charges arising from the sale of securities but <u>nevertheless finding probable cause</u> to issue a certificate of extradition to Canada).

13

**The Nature of the Evidence**

The seeds for this extradition proceeding were planted in August 1996, when Francisco Alberto Andujar-Mejia, the father of Francisco Alberto Andujar-Tejada, filed a criminal complaint with the Dominican Republic National Police, accusing Nunez of murdering his son. (DE# 1).  The General Prosecutor of the National District filed criminal charges against Nunez in August 1996, accusing him of committing the homicide of Francisco Andujar-Tejada.[2]

According to the Government's submission, Nunez remained in custody until late-December 1996, when he was released on bail pending his trial.  In September 1997, the Supreme Court of Justice revoked Nunez's bail and ordered his return to prison.  In March 1999, a pre-trial judge issued an order accusing Nunez of committing the homicide of Francisco Andujar-Tejada and sent his case to criminal court.  The Dominican Republic's extradition package explains that in September 1999 the Prosecutor General gave the authority to hear the criminal case against Nunez and several court dates were set that required Nunez's personal appearance.  The package also details that in July 2000 the presiding judge notified Nunez that, if he did not appear before the court as scheduled, then he would be held in contempt of court.  Nunez failed to obey that order and Nunez was convicted *in absentia* for murder on November 2000.

The Government's Extradition Request (DE# 17) consists of a declaration from an attorney advisor with the United States Department of State, a diplomatic note, an affidavit in support of the requested extradition, copies of sentences issued by the Court of Santo Domingo, a photograph of Nunez, the autopsy report, a declaration and witness statements.

---

[2]    The victim's name is also sometimes spelled "Tejeda" in the government's extradition package.  [*See, e.g.*, ECF No. 1, pp. 2, 15].  The Court selected the "Tejada" spelling for purposes of this order.

The United States did not introduce any live witness testimony at the extradition hearing, a circumstance which Nunez criticizes.  In his post-hearing submission, Nunez says "the DR should have sent Dr. Velez to testify as a live witness to explain his conclusions."  (DE# 74-1, p. 24).  He also emphasizes that "neither Dr. Velez nor Dr. Paez testified live or by video satellite to explain what happened to the photographs or to support their findings and conclusion."  (DE# 74-1, p. 25).

Nunez's comments are correct, but they are not legally significant.  It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request.  In fact, the United States Supreme Court has explained that one of the principal objectives of the extradition statute is "to obviate the necessity of confronting the accused with the witnesses against him" by enabling the requesting country to meet its burden of proof through documents subject only to requirements necessary to guarantee their authenticity. *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).  Moreover, the United States Supreme Court has succinctly summarized another benefit of having a documents-only extradition analysis: requiring the requesting country "to send its citizens to another country to institute legal proceedings would defeat the whole object of the treaty." *Id.*

18 U.S.C. § 3190, entitled "Evidence on [extradition] hearing," is another reason to discount Nunez's criticism of the Government's failure to present live witness testimony at the hearing.  Specifically, the statute provides that "depositions, warrants or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated . . . ."  Framed by this standard, courts routinely conclude that hearsay evidence is admissible in extradition proceedings, even if the substantive law of the

requesting country might not permit it.  *O'Brien v. Rozman*, 554 F.2d 780 (6th Cir. 1977) (holding that hearsay evidence in the form an affidavit from a foreign police officer, describing the evidence against an extradition defendant and attaching copies of signed statements, was admissible);  *see also generally* MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES, § 4-2(10)-(11) (2010) ("a requesting country ordinarily submits its evidence in support of an extradition request to the United States solely **in documentary form** . . . [a requesting country's] whole case for extradition could be presented through live testimony . . . however, such a theoretical situation is unlikely to arise") (emphasis added).

**The Prior *In Absentia* Conviction**

Most recent United States extradition treaties require a probable cause showing only if the fugitive has merely been charged but *not* yet convicted.  If a person was already convicted in the requesting country, the more recent treaties typically only require that the requesting country present an authenticated or certified copy of the sentence or judgment of conviction and proof that the requested person is the same person at issue in the judgment or sentence.  *See generally* MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES, § 4-2(10)-(11) (2010), § 3-2, p. 101.

In Nunez's situation, however, his conviction (for which he received a 20-year sentence) in the Dominican Republic was *in absentia*, which raises potential due process concerns.

In the absence of a treaty provision governing an *in absentia* conviction scenario, federal courts require the requesting country to submit the same evidence in support of an extradition request that it would have needed to submit if the defendant had only been charged with, but not convicted of, the offense for which extradition was requested.  In other words, the probable cause standard applies to extradition requests for defendants who were convicted *in absentia* in the

requesting country.  *In re Extradition of Harusha,* 2008 WL 1701428 at *6, n.1 ("proof of a conviction gained *in absentia* does not constitute probable cause. The court must still scrutinize the evidence to determine if there is a reasonable probability that the respondent committed the crime");  *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999) ("because defendants were convicted *in absentia*, that conviction is only considered a charge of a crime rather than a conviction for purposes of this Court's probable cause analysis"). *See generally* MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES, § 4-2, pp. 208-09.  *See also* M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION, Chp. VIII, § 4.8 (5th ed. 2007).

The United States does not rely on the *in absentia* conviction and concedes that a probable cause finding is required for an extradition certification against Nunez.

On the flip side of this issue, Nunez advises (DE# 74-1, p. 4) that he believes the *in absentia* conviction means that he will not receive a trial on the merits in the Dominican Republic if he were to be extradited.  Nevertheless, he candidly concedes that this issue "should not factor into the Court's consideration" because "the scope of this Court's order is on the issue of probable cause."  (*Id.*)  This concession conforms to established law, which provides that "an extradition magistrate does not have discretion to . . . make an inquiry into the conditions that might be encountered by a fugitive upon return to the requesting country."  *Prasoprat v. Benov*, 294 F. Supp. 2d 1165, 1169 (C.D. Cal. 2003).  *Cf. Sindona*, 619 F.2d at 174-75 (degree of risk to fugitive's life from extradition is "an issue that properly falls within the exclusive purview of the executive branch").

Given this limitation, which is sometimes known as the "rule of non-inquiry," it is hardly surprising that the Undersigned does not have authority to condition a certification of

extraditability on a guarantee that Nunez will obtain a new trial on the homicide charge for which he was convicted *in absentia.*[3]

The decision to impose conditions on an extradition is a non-justiciable political question committed to the Secretary of State. *See, e.g., Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) (noting that "the *Secretary of State* as a condition of surrender of persons demanded . . . has required . . . that there be a retrial of persons who have been convicted *in absentia*," observing that the court had "discovered no case authorizing a federal court, in a habeas corpus proceeding challenging extradition from the United States to a foreign nation, to inquire into the procedures which await the relator upon extradition," and explaining that "the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government") (first emphasis supplied); *see also Martin*, 993 F.2d at 829-30 (11th Cir. 1993) ("the rule of non-inquiry . . . precludes extradition magistrates from assessing the  investigative, judicial, and penal systems of foreign nations when reviewing an extradition request;" humanitarian argument should be directed to Secretary of State); *Escobedo*, 623 F.2d at 1107. *Cf. Juarez-Saldana v. United States,* 700 F. Supp. 2d 953, 960 (W.D. Tenn. 2010) ("In determining whether a fugitive should be extradited, the *Secretary* may consider factors including but not limited to . . . whether the fugitive is likely to be persecuted or denied a fair

---

[3]     Nunez contends that "the Court can make recommendation of conditions of extradition but the ultimate decision as to whether demand those upon the demanding state is up to the State Department." (sic) (DE# 74-1, p. 4).  As explained below, such a recommendation would be inappropriate, but even if it were appropriate, the Court would decline to make a recommendation on the evidence before it.  Although there is  a suggestion that Nunez will not receive a new trial upon his return to the Dominican Republic, the Undersigned is not an expert on the Dominican justice system and was not presented conclusive evidence on that issue.  Quite frankly, that is simply another reason why such determinations are left to the Secretary of State, who presumably has access to that sort of information.

trial or humane treatment upon his or her return . . . and information concerning judicial and penal conditions and practices of the requesting State").

A rule permitting the Undersigned to condition a certificate of extraditibility on Nunez's receipt of a trial on the merits in the requesting country would generate myriad difficulties:

For example, if this Court's probable cause analysis may be conditioned on a determination that a person convicted *in absentia* be afforded a new trial, then the Court would have to extend more favorable treatment to a fugitive who wrongfully and illegally fled from the jurisdiction of the requesting state than it would to otherwise similarly situated persons who did not commit that additional wrong of fleeing (and who therefore had a trial or proceeding, as opposed to an *in absentia* conviction).  It would be fundamentally illogical that a fugitive should be *rewarded* for his wrongful and illegal conduct.

To provide another problematic consequence, an approach that gives the extradition magistrate the authority to impose humanitarian conditions on extradition would inevitably lead to substantial inconsistency in the Nation's conduct of its foreign relations -- and would result in similarly situated fugitives being treated differently.

Finally, the Secretary of State is in a better position than this Court to assess the fairness of a foreign sovereign's criminal justice system and to balance this Nation's treaty obligations and foreign relations interests against its eminently legitimate concern for the future welfare of a person residing (lawfully or not) within our borders.

### III.  COMPETENT EVIDENCE ESTABLISHES PROBABLE CAUSE

Some evidence in this case is not in dispute.  Setting aside any additional evidence, these uncontested facts **alone are sufficient to generate the requisite probable cause** finding against Nunez.

Specifically, it is undisputed that the victim in this case died from a gunshot wound, that the fatal bullet was fired from Nunez's gun, that Nunez was holding that gun at the time it was discharged, ***and* that Nunez himself pulled the trigger**.  (DE# 23, p. 9) ("The claim that Mr. Nunez' statements demonstrate that he was holding the gun while it was fired, is stipulated to"); (DE# 59-5 at 23 (statement from Emil, the fugitive's cousin and witness at trial, that "it was then that *my cousin* [i.e., Nunez] *accidentally pressed the trigger* motivated by the struggle they had and the gun went off lethally wounding Francisco [Tejada]") (emphasis added).

Those facts, **in and of themselves**, standing alone, would provide a sufficient basis for arresting Nunez based on a probable cause determination and binding him over for trial if he were being prosecuted for murder in the United States.  *See, e.g.*, *Everett*, 719 F.2d at 1120 ("While intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause to arrest").

Indeed, not only is this evidence sufficient to create the requisite probable cause, but it is likely also sufficient to support a criminal conviction in this country.  Nunez's argument – that the gun discharged accidentally, not intentionally, while he was seeking to restrain the victim from driving while intoxicated – might be sufficient to create reasonable doubt.  But it also might be disbelieved by the finder of fact – in which case, the remaining facts would support a murder conviction.

For example, in *Whitehead v. Dormire*, 340 F.3d 532 (8th Cir. 2003), a criminal defendant convicted of second degree murder challenged his murder conviction in part on the ground that the evidence at trial was insufficient to prove he acted "purposely" when he shot his girlfriend.  Whitehead's defense at trial was that he accidentally shot his girlfriend.  According to his trial testimony, he loaded a rifle because he planned to scare her by telling her that he was

going to kill himself.  Defendant further testified that he held the gun across his chest when his girlfriend returned to the bedroom, that his girlfriend came toward him and pushed him across the chest when he told her he planned to kill himself.  But Whitehead claimed that he fell onto the lower part of the bed, landing flat on his back, causing the gun to discharge accidentally.  The circuit court held that there was more than sufficient evidence to support the jury's finding that he acted purposely and further noted that the jury was not required to credit his version of events.

Likewise, in *State v. Hayes,* 70 So. 3d 27 (Ct. App. La. 2011), the state appellate court upheld a second degree murder conviction (with a sentence of life at hard labor with no chance of parole, probation or suspension of sentence) in the face of a challenge that the evidence was insufficient to support the conviction.  In that case, Hayes admitted that he was present when the gun was fired but maintained that the shooting was accidental and unintentional.  According to Hayes, the victim, who was sitting in a locked car and speaking on the telephone, "freaked out" and grabbed the barrel of the gun when she saw the weapon.  Hayes claimed that his girlfriend "banged" him when he told her to place the gun in the glove compartment and the gun ejected.  The expert forensic pathologist who provided the autopsy report acknowledged that the gun was close enough to the victim's body for the victim to have touched the gun with her hand.  He also noted that he was <u>not</u> testifying that it was impossible that an accident occurred.  Hayes argued that the evidence was insufficient to prove he had the specific intent to kill the victim.  Instead, he testified that his actions amounted to no more than a tragic accident – a case of good intentions but poor judgment.  The appellate court held that the jury did not act unreasonably in

convicting Hayes and noted that the jury "made a credibility determination and rejected the defendant's hypothesis that the shooting was accidental.[4]

In addition to the significant and undisputed fact that Nunez pulled the trigger on the gun which fired the fatal shot which killed the victim, there is considerably more evidence to support a probable cause determination on the issue of whether Nunez committed the homicide. Considered together, these factors generate more than "a reasonable ground" for concluding that Nunez committed the homicide charged by the Dominican Republic:

1.      Perhaps most importantly, it is undisputed that the victim **died from a gunshot wound to the back of his head**.  (DE# 23-2 at 51 (autopsy concluding that the fatal bullet "followed a back to front trajectory")); (DE# 44-1 at 2, ¶5 (opinion of fugitive's own expert that "[t]he directionality of the wound is still determinable" and "appears to have been from back to front entering the back of the head")); (Hr'g Tr. Vol. II, DE# 69, p. 45).

Given this fact, it is significant that Nunez's own expert witness, Dr. Wright, conceded that,  "**as a general principle, a gunshot wound to the back of the head . . . would be deemed to supply at least some evidence, not necessarily conclusive evidence, but at least some evidence that a shooting was intentional**."  (Hr'g Tr. Vol. II, DE# 69, p. 45 (emphasis added)); *see, e.g.*, *State v. Manning*, 664 S.W.2d 605, 607 (Mo. Ct. App. 1984) ("the depiction of the [gunshot] wound in the back of Walker's head was relevant in that it tended to refute appellant's theory that he shot Walker in self-defense").

---

[4]      *See also, Gray v. Moore*, 520 F.3d 616 (6th Cir. 2008) (agreeing evidence was sufficient to sustain conviction for aggravated murder, to disprove the defense that the shooting was accidental and to show defendant had the requisite intent for aggravated murder); *Bowling v. State*, --S.E.2d--, 2011 WL 4905698 (Ga. 2011) (affirming convictions for felony murder and aggravated assault and finding that the evidence was sufficient despite defendant's defense that he accidentally shot the victim).

2.      Two forensic pathologists in the Dominican Republic expressly and unambiguously concluded that "[t]he cause of death [was] homicide." (DE# 23-2 at 51). In particular, those two experts found that the minimum possible distance between the victim and the mouth of the gun, when considered alongside the fact that the victim died from a gunshot wound to the back of the head, effectively ruled out the possibility that the defendant shot the victim by accident. (*Id.* at p. 51 (finding that the death of the victim "was due to a distance wound made by a projectile from" Nunez's gun)).

3.      It is undisputed that the fugitive and the victim had *some* kind of altercation just before Nunez shot and killed the victim. (DE# 23, Nunez proffer, p. 9 ("Mr. Nunez does not deny the altercation with Tejada that led to the accidental discharge of the firearm that was up for grabs")). Nunez and his cousin say that the fight centered on Nunez's alleged well-intentioned refusal to allow the victim to drink and drive. (*See* DE# 23 pp. 4-5, 11; DE# 28-3, p. 6). The available record evidence, however, does not rule out the possibility that the struggle between the defendant and the deceased arose out of some other dispute. For example, the two may have had a fight about the presumably sensitive matter that Nunez sought to discuss with the victim in private shortly before the shooting. (*See* DE# 28-3, p. 10 (statement from Cesar that Nunez told Cesar to leave Nunez and Tejada alone in the Jacuzzi because Nunez "wanted to talk to FRANCISCO [Tejada] about something")). Moreover, the fight may have involved the same dispute that prompted Nunez's aggressive conduct towards the victim earlier that evening. (*See id.* ("I saw EDDY throwing three rocks at FRANCISCO while he was in the Jacuzzi. He did not hit him with any of them, but *then he made a move like to beat Francisco with a bottle . . . .*") (emphasis added)).

4.      Competent record evidence tends to show that Nunez intentionally sought to inflict (or, at the very least, threatened to inflict) serious bodily injury on the victim shortly before the time of the shooting.  In particular, in a statement to the authorities, Julio Cesar related that Nunez first threw three rocks at the victim and then made *as if to beat the victim with a glass bottle* shortly before the time of the shooting.  (DE# 28-3, p. 10).

5.  Competent record evidence tends to show that Nunez repeatedly sought to be alone with the victim a short time before the shooting.  According to Julio Cesar, Nunez and Tejada were bathing in a Jacuzzi earlier that night and Nunez "told [Cesar] to go and watch TV [because] he [Nunez] wanted to talk to Francisco about something" in private.  (DE# 28-3, p. 10).

6.      The record contains evidence that the defendant repeatedly sought to prevent the victim from leaving the defendant's home on the night of the alleged crime. (*See id.* at pp. 9-10 (noting that "[W]hen FRANCISCO wanted to leave, EDDY would sit him down and tell him not to go, where was he going anyway, and then they decided to bathe in the Jacuzzi" and stating that, when Cesar went out to the Jacuzzi because he wanted a ride home from Tejada, Nunez "told [Cesar] to tell Emil to take" Cesar home)).

The record contains evidence that the defendant has a history of engaging in aggressive and reckless conduct, including senseless, unprovoked, and potentially lethal bouts of violence. When asked why Nunez threw three rocks at Tejada and then sought to hit Tejada with a rum bottle, Cesar stated that Nunez acted like that "all the time" and generally had a "VERY AGGRESSIVE" personality.  (*Id.* (emphasis in original)).  Cesar noted that "EDDY . . . was all the time dra*wing* his gun and pointing it at friends and everyone that happened to be nearby." (*Id.* at 11) ("he liked to play with his gun and point it at us;" "one day in front of the church San

24

Judas Tadeo, we were hanging out together and EDDY just for the hell of it shot his gun six times").

7.       Record evidence indicates that Nunez consumed a significant amount of alcohol on the night of the shooting.  (*See* DE# 28-3, p. 2 ("EDDY drank two bottles and [a] half [of rum] and one beer").  Alcohol consumption generally diminishes inhibitions, and other record evidence (as noted above) shows that Nunez had a predisposition to engage in reckless and unprovoked bouts of potentially lethal violence.  It is not unreasonable to suppose that, if exacerbated by considerable alcohol consumption, Nunez's predisposition might have caused him to respond to a heated disagreement more aggressively than he otherwise would have.

8.       Competent record evidence tends to show that Nunez's maid was woken up in the middle of the night by the lady of the house ***and ordered to clean up the blood at the crime scene*, including (and first) all the blood in the very room in which the victim was shot, *before the police arrived*.**  (DE# 59-5, pp. 35-36; *see also* Hr'g Tr. Vol. III, DE# 70, p. 42 (noting that the Office of International Affairs obtained an oral representation from its liaison at the prosecutor's office in the Dominican Republic, confirming that the blood evidence at the crime scene was wiped away by the maid, at the direction of the fugitive's mother, *before* the police arrived on the scene)).[5]

In the Court's view, this additional evidence is more than sufficient to establish a mere "substantial chance" that Nunez intentionally shot a man he concededly shot and killed.  The

---

[5]       An effort to conceal or destroy evidence can be evidence of guilt.  The decision to clean up the blood spatter evidence in this case is not rendered meaningless by the mere fact that it was Nunez's mother who directly ordered the maid to destroy that evidence.  Nunez's family members might well have been acting at his behest or on his behalf.  Accordingly, the fact that Nunez's mother thought it necessary to have a potentially important source of evidence (according to Nunez's own expert witness) destroyed is relevant to the probable cause analysis.  At the very least, it is relevant to the issue of whether Nunez and/or his family thought the shooting was purely accidental or whether it was intentional.

case law fully supports that finding. *See, e.g.*, *Extradition of Harusha*, 2008 WL 1701428, at *6 (evidence that fugitive was present at scene and shot the victim was "more than sufficient" to establish probable cause for homicide); *Hoxha*, 465 F.3d at 560-62 (even though case was "riddled with holes," evidence sufficed to show probable cause for murder; fact that fugitive was seen "near" site of murder two weeks before the shooting provided additional evidence of guilt); *In re Extradition of Ramos Herrera,* 268 F. Supp. 2d at 696-97 (holding that fugitive's evidence that he "did not have any intent to shoot" the victims was not relevant at extradition proceeding); *Antunes v. Vance*, 640 F.2d 3, 3-4 (4th Cir. 1981) (holding that record evidence "amply" supported finding of probable cause that defendant committed intentional murder, a charge for which he was convicted *in absentia*, where the defendant and a companion were involved in a street fight with the victim, the fight "resulted in the death" of the victim, the defendant and the companion fled from the scene of the crime and subsequently fled the country, and the defendant later wrote a letter stating that he had "caused a death"); *see also* R ESTATEMENT (T HIRD) OF F OREIGN R ELATIONS L AW §476 cmt. a ("Evidence going to the merits of the charge, including . . . **lack of criminal intent**, ordinarily is **not admitted** in an extradition hearing, on the ground that guilt or innocence is most suitably determined by a court of the state whose law is alleged to have been violated") (emphasis supplied).

Notably, Nunez does not cite any case in which a court *refused* extradition in similar circumstances.

## IV. NUNEZ'S CONTRADICTORY EVIDENCE IS IRRELEVANT AND
## INSUFFICIENT TO COMPLETELY OBLITERATE PROBABLE CAUSE.

The Government correctly notes, in its post-hearing submission, that it has consistently taken the position that Nunez's evidence is impermissible contradictory evidence. Although Nunez has long been aware of that position, he has never even tried to argue that the evidence he asks this Court to consider is permissible explanatory evidence within the meaning of the case law. To the contrary, Nunez has expressly conceded that his evidence is intended to contradict or challenge otherwise competent evidence in support of the Government's submission. (*See, e.g.*, Hr'g Tr. Vo. III, DE# 70, p. 88 ("[W]hat we have in this case is a version of facts submitted by the government. We have ***a challenge to some of those facts presented by the defendant***, and then we have the presentation of some facts on the defendant's part which this Court has permitted and allowed") (emphasis supplied); *see also* Hr'g Tr. Vol. II, DE# 69, p. 54 (Nunez's counsel following up on Dr. Wright's testimony that a gunshot wound to the back of the head constitutes competent evidence of intent by asking: "Where an eyewitness saw the shooting and said it was accidental, would that *neutralize* . . . any indicia that a shooting behind the head was intentional?") (emphasis added)).

The Court **FINDS** (and previously noted, earlier in this Order) that the testimony offered by Nunez's witnesses and the documentary evidence Nunez asks this Court to consider constitute impermissible contradictory, rather than permissible explanatory evidence.

Although the contradictory nature of the evidence means that this Court should not consider it as part of the probable cause analysis, the Court will review Nunez's evidence and

explain why it will not be considered (and why it is insufficient to prevent the requisite probable cause finding):[6]

**Emil Garrido's testimony.**   At the extradition hearing, Nunez's cousin, Emil Garrido, testified that he was present at the time of the shooting and believes that Nunez pulled the trigger accidentally.   Depending on the applicable law in the Dominican Republic, Emil's testimony might be sufficient to warrant Nunez's acquittal at a plenary trial or trial-like proceeding -- but it does not provide a basis for resisting a probable cause-based extradition, for several reasons.

*First*, Emil's testimony concerning the allegedly accidental nature of the shooting constitutes impermissible **contradictory** evidence.   This is not a case in which the sole evidence in support of probable cause is a report finding that Nunez was holding the gun and pulled the trigger at the time the fatal bullet was fired.   Two expert pathologists found that the available forensic evidence ruled out Nunez's claim that he shot the victim by accident.   Therefore, Emil's claim that the shooting was accidental is flatly inconsistent with (i.e., it contradicts) the conclusion expressly and unambiguously set out in the autopsy report.   Emil's version of what happened on the night of the shooting cannot be thought to merely "explain" the Government's evidence.   *E.g.*, *Hoxha*, 465 F.3d at 561-62 (defendant's evidence concerning the events at issue did not "obliterate probable cause; instead, ***it provided an alternative and contradictory narrative that can properly be presented at trial***") (emphasis added).

*Second*, even *if* Emil's testimony did not contradict the Government's proof (which it does), Emil's testimony cannot completely obliterate probable cause because Emil could not possibly know with certainty what Nunez was thinking when he pulled the trigger.   The absolute

---

[6]     *See Cheng Na-Huet v. Hueston,* 734 F. Supp. 988, 996 (S.D. Fla. 1990) (noting that, although extraditee presented "a set of facts which could be consistent with her innocence, such presentation clearly fails to 'negate' the Hong Kong Government's showing of probable cause" on kidnapping charges).

*most* that Emil can say is that it *appeared* to him that Nunez did not mean to shoot and kill the victim.  Even if accepted at face value and deemed credible, this evidence might well be sufficient to create reasonable doubt concerning Nunez's guilt -- but it does not "obliterate" the myriad other sources of evidence tending to show that Nunez *did* act with the requisite criminal intent.

*Third*, this Court could not conclude that Emil's testimony was adequate to obliterate completely the probable cause without also deciding to credit his testimony **over** inconsistent evidence in the record (such as the autopsy).  In other words, the type of conclusion which Nunez asks this Court to make here would require a weighing of evidence and a selection of one version over another version.  This type of evidence evaluation is precisely what this Court *cannot* do in an extradition hearing.  *Bovio v. United States,* 989 F.2d 255, 259-261 (7th Cir. 1993) (evaluating accused's challenge to extradition request from Sweden, rejecting his challenge that the investigator's statements were made five years after the investigation and that there was no record of original witness interviews and concluding that the defendant "has no right to attack the credibility" of either of the two witnesses "at this stage of the proceedings" because "issues of credibility are to be determined at trial").[7]

This Court could not possibly make such a delicate credibility determination without having heard *any* testimony from the two forensic pathologists, Julio Cesar, and other potential witnesses the Government might seek to call at a plenary trial.  A credibility determination of that kind should be made by the ultimate finder of fact after considering all of the available evidence and after assessing the demeanor and credibility of competing witnesses.  It would be illogical, impractical and improper for this Court to weigh Emil's live testimony against

---

[7]     *See also Barapind*, 400 F.3d at 749 ("extradition courts do not weigh conflicting evidence in making their probable cause determinations").

statements recited in a dry documentary record.  In fact, as noted above, directly controlling authority prohibits this Court from punishing the requesting state for not bringing its witnesses to the extradition hearing and not submitting all available evidence.  *See, e.g.*, *Bingham*, 241 U.S. at 517 ("a construction of [the extradition statute and treaties] that would require the demanding government to send its citizens to another country to institute legal proceedings would defeat the whole object of the treaty"); *Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005) ("**extradition courts do not weigh conflicting evidence in making their probable cause determinations**") (alteration omitted; emphasis supplied).

Emil's testimony <u>contradicts</u> a large portion of the record evidence appropriately submitted by the United States and it would be inappropriate under clearly established law for the Undersigned to weigh such competing evidence.  There are additional examples that clearly illustrate this point:

- **Nature of the struggle:**  Emil testified that he remembered, "*without any hesitation*," that "Eddy's feet and Francisco's feet were **on the ground** at the time"—that is, "at the time the gun went off."  (Hr'g Tr. Vo. I, DE# 68, p. 59 (emphasis added)).  But Eddy told the authorities that Francisco was taking the car keys from me and the keys fell to the floor underneath the bed *and I fell on top of him and **then** a shot came out of my regulatory firearm*."  (DE 59-3, p. 16 (emphasis added); *see also* Hr'g Tr. Vol. I, DE# 68, p. 60 (Q:  "When you just showed us what happened, had Eddy fallen on top of [Francisco]?  A:  "Fall[en] on top of [Francisco], no;" Emil then reversed course somewhat and stated that Eddy "*might have stumbled* against" Francisco, but not that the gun went off after Eddy had fallen on top of Francisco)).

- **Nunez's threat shortly before the shooting:**  Emil testified that Eddy did not threaten

to hit the victim with a glass bottle shortly before the shooting.  Julio Cesar's statement to the police flatly contradicts that testimony.

- **Consumption of alcohol:** Emil said Julio Cesar was the second most drunk person at the party.  Julio Cesar said he did not have *any* drinks that night.

- **Eddy's propensity to engage in senseless bouts of potentially lethal violence:** Emil said he never saw or even heard of an incident in which Eddy recklessly displayed or fired his gun.  (*Id.* at pp. 29-30).  Julio Cesar said otherwise.

*Fourth*, even if this Court were permitted to weigh Emil's testimony against other evidence in the record, many aspects of Emil's testimony exhibited bias, were implausible, or otherwise problematic.  Those problems, standing alone, would preclude this Court from concluding that Emil's testimony completely obliterates probable cause.  For example:

- Emil is Eddy's cousin and has known Eddy his "whole life."  (Hr'g Tr. Vol. I, DE# 68, p. 48).  While Emil said that he and Francisco were "like brothers," Emil himself acknowledged that he had known Francisco for only about seven months at the time of the shooting, and that his relationship with Eddy was "substantially closer" than his relationship with Francisco.  (*Id.* at pp. 48-49).  This demonstrates, or could demonstrate, bias.

- Emil testified that Eddy's gun was in his bathing suit even though Eddy was in his own home and had just got out of the Jacuzzi, (*Id.* at p. 32), but there was nothing unusual about that.  (*Id.* at p. 61 (stating that Eddy had the gun in his bathing suit, and that this was "the normal thing;" "Q:  You don't find it odd the moment [Eddy] came out of the Jacuzzi one of the first things he would have done would be to put the gun in his bathing suit?  A:  No")).  In the Court's view, it is certainly unusual for any person to carry a loaded gun in a wet bathing suit for no

apparent purpose, and especially so when that person is surrounded by friends and family and in the safety of his own home.  Thus, this testimony, at best, is plagued with a credibility issue.

- Emil claimed to be "quite sure" that he knew "exactly what [Eddy was] thinking" at the time of the extradition hearing itself.  (*Id.* at p. 49).  That suggests overconfidence and/or a conscious determination to help his cousin by making exaggerated claims.  It could also be reflective of a lay witness who is not familiar with American legal proceedings and does not understand the difference between personal knowledge and rank speculation.  Whatever the reason for the answer, though, the significant point is that the answer is problematic, cannot simply be accepted at face value and suggests that other answers from Emil should be scrutinized.

- Emil testified that Francisco did not "offer any resistance" whatsoever when Emil, at Eddy's instigation, physically took Francisco's car keys from his pocket.  (*Id.* at p. 28).  Yet Emil also testified that Francisco was so upset that Eddy would not give him back his keys that he went searching for Eddy's gun.  This testimony seems to paint two distinctly different portraits of Francisco on the night he was fatally shot and is either inherently inconsistent or portrays Francisco as having wild mood swings.

- Emil said that he, Eddy, Francisco, and Julio Cesar had a standard practice when they drank: the person who drank the least was "always" the one who drove the others home after a party.  (*Id.* at pp. 33-34).  Given this testimony about the standard practice, it seems unlikely that Francisco was so upset over conduct which was nothing more than the standard practice  that he went to look for a gun.

- Emil said he could see *and* hear -- through a window -- virtually everything that Eddy and Francisco did and said and to one another when they were in the Jacuzzi, even though Emil

was lying down on a bed for at least part of that time.  (*Id.* at pp. 52-53, 55 (Email stating that "Unless they were telling each other a secret, I heard everything;" that he was sure Eddy did not throw rocks at Francisco "[b]ecause the two of them I could see through the window," even though Emil himself acknowledged that normal movements of the head would have caused him to lose his "fixed sight" on Eddy and Francisco; and that it was not even *possible* that Julio Cesar was telling the truth about certain things he saw and heard when Emil was lying on the bed in another room)).

- Emil testified that Julio Cesar asked Emil to drive him home.  (*Id.* at p. 22).  But Emil also testified that he did not have a car.  (*Id.* at p. 24).  The suggestion is, at best, confusing. Why would Cesar ask Emil to take him home if Emil did not even have a car?  Moreover, it was *Francisco* (Julio Cesar's cousin) who drove Julio Cesar to the party, so it seems entirely plausible that Julio Cesar would expect and seek to go home (as he told the police) with Franciso, the person who took him to Eddy's in the first place, not with Emil.

- Emil said that he took Francisco's keys and gave them to Eddy just before the shooting. (*Id.* at p. 27).  But he also said that "the key was not to be found" just seconds or minutes later, and that Eddy's brother had to break the window of Francisco's vehicle.  (*Id.* at p. 41).

- Emil's testimony exhibited a highly selective memory.  For example, Emil testified that he did not remember whether he arrived at Eddy's house with Julio Cesar.  (*Id.* at p. 18).  He also said he did not remember whether Eddy threw rocks at Francisco while the two were sitting in the Jacuzzi.  (*Id.* at p. 26).  Emil did not remember telling the police that he went to lie down in Eddy's room because he was sleepy.  (*Id.* at p. 53).  Yet Emil claimed to remember the exact order in which the four men were drunk some 15 years ago.  (*Id.* at p. 21).

**Doctor Wright's testimony**.  At the hearing, Dr. Wright testified about certain concerns he had with some aspects of the autopsy report.  The Court finds that Dr. Wright's testimony is irrelevant and insufficient to negate probable cause.

*First*, Dr. Wright purported to *explain* the conclusions and the validity of those conclusions.  That is classic contradictory evidence, to be presented at a trial on the merits, but not at a preliminary hearing.

*Second*, Dr. Wright's testimony, even if it were deemed "explanatory," does not and could not completely *negate* probable cause.  Indeed, his testimony would be inadequate to negate probable cause even if it created reasonable doubt as to Defendant's guilt.[8]  For example:

- Even if Dr. Wright's testimony could conclusively determine that the wound was not a distance wound, it would not rule out the possibility that the shooting was intentional.  (Hr'g Tr. Vol. II, DE# 69, pp. 33-34, 57 (acknowledgement that "a person [can] intentionally shoot and kill a victim from a short or intermediate distance")).

- Dr. Wright did not say the autopsy result was *wrong*.  Rather, he said he could not *prove* whether it was correct based on the information available to him, which was *not* the same information available to the pathologists who conducted the autopsy.  For example, he stated that it was "certainly" "possible that the two forensic pathologists who prepared the [autopsy] report prepared a scientifically accurate report," but that, on the basis of the information he had available to him, he could not "prove that it's accurate to a reasonable degree of [scientific]

---

[8]    *See e.g., Noel v. United States,* 12 F. Supp. 2d 1300, 1303-04 (M.D. Fla. 1998) (responding to defendant's argument that the evidence against him amounted to nothing more than "guilt by association" with the following explanation: "Although the reliability issues presented by Petitioner may create reasonable doubt as to his guilt, that is not the issue before this Court.  At this stage, it is only necessary to determine whether there exists 'any evidence of probable cause'")

certainty."  (Hr'g Tr. Vol. II, DE# 69, p. 45; Hr'g Tr. Vol. III, DE# 70, p. 102 ("*He's not saying that it's wrong*.  But he says you can't say that it's right") (emphasis added)).

- The sole basis for Dr. Wright's evaluation was his review of the autopsy report.  (Hr'g Tr. Vol. II, DE# 69, pp. 15, 17 ("Q.  What did I give you?  A. The autopsy report in Spanish and a translation that seemed to be pretty accurate.  That was basically it;" also noting that "[i]t would have been very helpful to have photographs taken at the time of the autopsy," but "I didn't get to see the photographs of the autopsy")).

- Dr. Wright himself acknowledged that rates of decomposition are "very variable," and that **"I won't know until I look."**  (*Id.* at p. 25 (emphasis supplied)).

- As the doctor acknowledged, the two expert pathologists who did the autopsy had access to more information than he did.  Most importantly, they saw the body and he did not.  Moreover, even assuming that the degree of decomposition was too great to allow the conclusions set out in the report (an assumption the doctor's testimony does not conclusively establish, even if he is credited), the autopsy report suggests that photographic evidence not reviewed by Dr. Wright is available; and Dr**.** Wright admitted the two forensic pathologists who did the autopsy *may* have had photographs of the body "at the time of or in close proximity to the shooting."  (*Id.* at p. 56).

- Dr. Wright's testimony, to his credit, was conditioned with caveats and qualifications.  (*E.g.*, *id.* at pp. 18, 20, 22-23, 25-26, 40-41 (stating that the "state of decomposition" would "depend[] on what was done with the body" and opining that the state of decomposition would have been "advanced" if there was no embalming, but acknowledging that "[t]here might have been" embalming; agreeing that "maybe there was embalming done;" testifying that he had "a little problem with this being called a distance wound," since the "amount of decomposition"

which occurred, "in my opinion, *probably* precludes the ability to tell that," even though the doctor admitted that he did not observe the state of decomposition and was making negative inferences based on the description in the autopsy; explaining that "a ricocheted bullet makes a nonround hole," and that "*it isn't entirely clear* whether [the entrance wound] is completely circular or not;" admitting that some embalmed bodies "look pretty good [even] after a year," that "I don't know what I will find until I find it," and that "I won't know until I look" [at the body itself]; stating that he would "*probably not*" have been able to make a distance determination even with photographs, which he did not have; admitting that the "decomposition process varies a relatively great amount" from case to case; noting the body was likely "*somewhat* brittle and discolored;" stating that "[e]xactly how much you can usually tell from photographs," which the doctor did not have or see) (emphasis supplied)).  In light of those many qualifications, his testimony could not be said to successfully and completely discredit the two Dominican pathologists' conclusions, and therefore is inadequate to negate probable cause.

• The "sum and summary" of Dr. Wright's testimony was that he could not agree "to a reasonable degree of medical and forensic certainty that the cause of death of Francisco in this case was homicid[e]."  (Hr'g Tr. Vol. II, p. 32).   The question before this Court (an extradition court) is not whether the autopsy conclusions are valid to a "scientific certainty;" it is whether there is *competent* evidence to support a "substantial chance" that the defendant is guilty. Therefore, even if considered and completely accepted, the core of Dr. Wright's testimony is insufficient to preclude a conclusion that there is probable cause.

*Third*, much of Dr. Wright's testimony affirmatively *helps* the Government's case.   In particular, he testified:

- A gunshot wound to the back of the head supplies competent evidence of intent to kill. (*See, e.g.*, Hr'g Tr. Vol. II, DE# 69, p. 45 (acknowledging that his own report stated that the bullet's trajectory "appears to have been from back to front entering the back of the head," and agreeing that "as a general principle, a gunshot wound to the back of the head . . . would be deemed to supply at least some evidence, not necessarily conclusive evidence, but at least some evidence that a shooting was intentional").

- Evidence consistent with a close contact wound was not present in the autopsy. (*Id.* at p. 21 (noting that the autopsy report did not mention the kind of deposits on the skin that would result from a close contact wound)).

- It is highly unlikely that there was a ricochet. (*Id.* at pp. 42-43, 53, 58 ("[I]f there is no mention [in the autopsy report] that [the wound] isn't round, it's taken to be round because most entrance gunshot wounds are round because most gunshot entrance wounds are fired directly from the end of the barrel into the person;" testifying that a "round wound" would "almost absolutely" "tend to rule out the possibility of a ricochet," "it's possible" that the autopsy could have validly concluded that the entry wound was circular, particularly if the body had been embalmed; "If [the bullet] was fired in the way that it was depicted in the demonstration [put on by Nunez's counsel and Emil], *it did not ricochet*") (emphasis added)).

*Finally*, Nunez's reliance on Dr. Wright's testimony would require this Court to resolve a highly technical issue of forensic pathology by **crediting Dr. Wright's opinions over the two pathologists who prepared the autopsy report** -- even though this Court has not heard testimony from those pathologists, does not know what information they had available to them, and has not heard testimony from any other expert *not retained by Nunez himself*. Moreover, it would mean that this Court would need to determine that one pathologist who never examined

the body is more credible than two pathologists who did examine the body.  Differences of opinion between the pathologists should be weighed by a finder of fact at a full-fledged trial or similar proceeding, not by a magistrate judge serving as an extradition judge during what is tantamount to a probable cause hearing.

**Nunez's "testimony":**  Nunez chose to not testify at the hearing.  Nevertheless, he seeks to have his version of events considered – through the witness statement which was prepared several years ago, denying that he intended to fatally shoot Francisco.  But a defendant's mere denial of criminal intent is insufficient to completely negate probable cause.  Moreover, it is undisputed that Nunez previously made false statements to the United States, which provides grounds for the Court to refuse to blindly accept his version of events.  (*See* Government's Hr'g Ex. 1 at 3, 4, DE# 65 (Nunez falsely denying, under penalty of perjury in an immigration I-485 form, that he had "ever, in or outside the U.S. . . . been arrested . . . for breaking or violating any law or ordinance, excluding traffic violations"); Hr'g Tr. Vol. III, DE# 70, p. 92 (concession from Nunez that documentary evidence establishes that he perjured himself in his application for LPR status); *see also* Government's Hr'g Ex. 2, p. 2 (establishing that Nunez came to the U.S. under false pretenses, as he was admitted as a "nonimmigrant visitor for pleasure" and then "overstayed his admission")).  The Court neither accepts nor substantively rejects this indirect testimony from Nunez; it merely notes that the evidence is contradictory (which is procedurally improper in this limited extradition hearing) and would be appropriate for the ultimate fact-finder to review (but not for an extradition magistrate judge).

.

## V. OVERALL EVALUATION OF NUNEZ'S POSITION

Nunez urges this Court to assess whether there is more evidence for his guilt than against (or "sufficient probable cause") *after* considering all of the evidence Nunez would be permitted to present at a full-blown criminal trial.

Nunez wants the Undersigned to conclude that "the Velez/Paez autopsy is useless." (DE# 74-1, p. 25).  Pointing out that "it may be that nobody will ever really know, 100%, what Eddy's true intentions were when he fired his pistol almost 15 years ago."  (DE# 74-1, p. 24).  Nunez *also* asks the Undersigned to conclude definitively that "the immediacy of this attack and the sudden discharge of the firearm are more consistent with an accident than an intentional shooting."  *Id.*

Nunez advocates the position that "there was no **motive** for Eddy to kill Francisco."  But motive is <u>not</u> required for a probable cause determination in a homicide case, *Johnson v. City of New York*, 401 F. Supp. 50, 52 (S.D.N.Y 1975) (holding that "the law does not require . . . motive, only reasonable cause for arrest"), and this argument ignores the fact that Nunez had been drinking, that Nunez exhibited aggressive tendencies toward Francisco earlier in the evening, that Nunez has (or had at the time) a reputation for aggressive and physical conduct and that Nunez was agitated and annoyed with Francisco.  *Cf. Hodges v. Attorney Gen.*, 506 F.3d 1337, 1343 (11th Cir. 2007) (noting that "while evidence of motive is admissible and may be important, motive is not an element of a murder prosecution" under Florida law).

Not only do these contrary-type arguments depend on an outdated and inapplicable definition of probable cause, but they are foreclosed by directly controlling authority.

Moreover, Nunez's argument would generate extraordinarily troubling practical implications for the conduct of extradition proceedings and even for ordinary domestic criminal proceedings.

In order to rule in Nunez's favor, this Court would have to credit Emil's testimony over contradictory evidence in the record.  But this Court has not seen *all* the evidence for the prosecution (just as a grand jury or a judge presiding over a preliminary hearing does not see all the evidence at that stage of the case).  Instead, it has reviewed only the documentary evidence the Dominican Republic thought necessary to submit for the limited purpose of establishing probable cause.  *See, e.g.*, *Sidali*, 107 F.3d at 200 (requesting state "is not required to present its entire case in this country").

If the Court were to rule in Nunez's favor, then it would send an unfortunate and undesirable message to requesting states which entered into treaties with the United States:  To avoid the risk that the magistrate would allow the fugitive to mount a full defense and then credit the fugitive's contradictory evidence over the requesting state's necessarily less-compelling paper submissions, a state would need to submit all of its evidence at the probable cause stage, send all of its witnesses to the site of the extradition proceeding and be prepared to fully litigate any and all potential defenses to criminal liability as if the hearing were a full-fledged final trial.  Such a message would work a dramatic, impracticable, and prohibited transformation in the conduct of extradition proceedings.

Nunez's position also carries troubling implications for domestic criminal investigations and prosecutions.  If Nunez is correct that the Government has not in this case submitted competent evidence establishing probable cause, then a magistrate judge following the same probable cause definition would not sign a warrant for a murder suspect's *arrest* even if

presented with a sworn affidavit reciting all of the evidence described above:  i.e., that the victim died from a gunshot wound to the back of the head, fired from a gun held by the suspect; that the suspect pulled the trigger; that *two* forensic pathologists concluded that the forensic evidence ruled out the possibility that the shooting was accidental; that the suspect had threatened to inflict serious bodily harm on the victim shortly before he shot and killed him; and that the suspect's mother destroyed blood spatter evidence at the crime scene before the authorities arrived. Likewise, it would mean that a grand jury confronted with identical facts would not return an indictment against Nunez for a fatal shooting in the United States.  It would even mean that a police officer would lack the probable cause to arrest Nunez in the first place if confronted with the same evidence in this country concerning a domestic fatal shooting.

These projected scenarios, which would be compelled by Nunez's view of probable cause, are troubling.  They are troubling because it is virtually impossible to agree that the scenarios could happen under our criminal justice system.

## <u>OTHER, ANALAGOUS DECISIONS ON EXTRADITABILITY</u>

To be sure, probable cause determinations in extradition cases are fact-specific, and the mere fact that one court issued a certificate of extradition in a different homicide case does not dictate whether another court would or should issue a similar certificate in another case. Nevertheless, decisions in other cases are analytically helpful when they discuss basic *principles* in factually similar cases.

The following extradition cases generate support for the conclusion that this Court should not consider the rebuttal-type evidence offered by Nunez and for the probable cause finding in the face of contradictory evidence:

*In re Extradition of Pena-Bencosme*, 341 F. App'x 681 (2d Cir. 2009).   In this extradition-related lawsuit, the defendant filed a petition for a writ of habeas corpus, challenging his potential extradition to the Dominican Republic.   The circuit court held that there was sufficient evidence to support the extradition judge's finding that there was probable cause to believe the defendant committed a **homicide in the Dominican Republic**.   Specifically, the government presented sufficient evidence to produce a probable cause finding that Pena-Bencosme committed the homicide because, at the very least, **he shot the victim**.   Although the testimony offered by both sides was contradictory, some witnesses testified in favor of Pena-Bencosme's **self-defense theory** and although defendant objected to the non-production of a ballistics report, the circuit court reviewed only the issue of whether the judge had any evidence warranting his finding to certify the extradition.   The circuit court's analysis is directly applicable to Nunez's arguments:

> Given the limited nature of this review as well as the underlying requirement that a requesting country establish only probable cause, the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import as it does not vitiate or obliterate probable cause, but rather merely poses **a conflict of credibility** that generally should properly await trial in the requesting country.

*Id.* at *1 (brackets and internal quotation marks omitted; emphasis supplied).

*Castro Bobadilla v. Reno*, 826 F. Supp. 1428 (S.D. Fla. 1993), *aff'd*, 28 F.3d 116 (11th Cir. 1994).   In this extradition case, the government of Honduras sought to extradite one of its citizens who had been charged with murder in Honduras.   Castro was arrested in Honduras but fled to the United States while receiving medical treatment.   The magistrate judge found sufficient, albeit not overwhelming, evidence of probable cause to support the extradition.   That court held that a review of the probable cause finding on petition for writ of habeas corpus is

limited to "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Id.* at 1433 (internal quotation marks omitted). The Court noted that Castro's testimony only provided an "opposite version of the facts as presented by the government," which does not invalidate the probable cause conclusion.

Significantly, a medical examiner testified about the "sloppy manner" in which the victims' bodies were examined in Honduras and noted specific inconsistencies in the investigation. Nevertheless, the court found that the medical examiner's testimony was insufficient to negate the government's evidence. The court found sufficient probable cause in the face of the contradictions in the evidentiary record.

Making a point which is directly applicable to the instant case involving Nunez, the *Castro Bobadilla* court explained that an extradition hearing is "not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested." *Id.* at 1432.

*In re Extradition of Harusha,* 2008 WL 1701428. In this extradition case initiated at the request of the Albanian government, Harusha was convicted *in absentia* of murder and attempted murder, but he argued he fired in self-defense at two suspected thieves. Although the court noted that "[p]roof of a conviction gained *in absentia* does not constitute probable cause," *id.* at *6, n.1,* the court there determined that the following evidence sufficed for a probable cause finding for murder: Harusha and the victim had a dispute, Harusha shot and killed the victim and seriously injured the victim's son during the argument, eyewitness testimony identified Harusha as the shooter and another eyewitness saw Harusha running away with a gun in his hand after the shooting. In rejecting the self defense theory, the court emphasized that its "role is not to

determine and not to offer any opinion as to whether the evidence is sufficient to justify *convicting* Harusha of murder or attempted murder."   *Id.* at *6 (emphasis in original). Significantly, the court explained that "affirmative defenses, including self-defense, are not relevant in extradition hearings and **should not be considered**." *Id.* at *5 (emphasis supplied).

   *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986).   The United Kingdom sought the extradition of Quinn, a member of the Irish Republican Army, in order to try him for a murder and for conspiracy to cause explosions in London.  After a United States magistrate found Quinn extraditable, he filed a petition for a writ of habeas corpus.  The district court determined that Quinn could not be extradited under the political offense exception.  After the United States appealed, the circuit court concluded that the political offense exception was inapplicable and also held, in the face of an evidence-based challenge by Quinn, that the magistrate did not err in finding probable cause that Quinn murdered a police officer.  In doing so, the appellate court noted that the evidence was "not overwhelming" and that Quinn "could not be convicted" if "that were all the evidence introduced at a murder trial."  However, the Ninth Circuit relied upon the well-established rule that "it is not our role to determine whether there is sufficient evidence to convict the accused" and noted that "the magistrate does not weigh conflicting evidence and make factual determinations."  *Id.* at 815.

## VII. REQUEST FOR CONDITIONAL EXTRADITION

   Finally, Nunez asks this Court to condition the issuance of any certification of extraditability in this case on a guarantee that he will get a new trial on the homicide charge for which he was convicted *in absentia*.  The Court declines that request for several reasons:

   *First*, and most importantly, the decision to impose conditions on an extradition is a non-justiciable political question committed to the Secretary of State.  *See, e.g.*, *Gallina*, 278 F.2d at

79 (noting that "the *Secretary of State* as a condition of surrender of persons demanded . . . has required . . . that there be a retrial of persons who have been convicted *in absentia*," but observing that the court had "discovered no case authorizing a federal court in a habeas corpus proceeding challenging extradition from the United States to a foreign nation, to inquire into the procedures which await the relator upon extradition," and explaining that "the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government") (first emphasis added); *see also Martin*, 993 F.2d at 829-30 ("the rule of non-inquiry . . . precludes extradition magistrates from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request;" humanitarian argument should be directed to Secretary of State); *Escobedo*, 623 F.2d at 1107; *In re Extradition of Harusha*, 2008 WL 1701428 at *9, *11-*12 (noting representations that the Department of State would seek assurances that the fugitive be given a new trial, and including dictum in which the Court "urges the United States Department of State to honor [those] representations" and to condition the ultimate decision to extradite on such an assurance, but not conditioning the **court's** issuance of the certificate of extraditability on the same); *Juarez-Saldana,* 700 F. Supp. 2d at 960 ("In determining whether a fugitive should be extradited, the *Secretary* may consider factors including but not limited to . . . whether the fugitive is likely to be persecuted or denied a fair trial or humane treatment upon his or her return . . . and information concerning judicial and penal conditions and practices of the requesting State").

 *Second*, and somewhat relatedly, this Court is charged with the limited task of determining whether there is probable cause to believe that the fugitive committed the charged offense.  Indeed, throughout this litigation Nunez himself has insisted that probable cause is the sole issue in dispute.  Simple logic dictates that the question whether there is probable cause to

believe that Nunez committed the charged offense *in the past* cannot turn on what may or may not happen to him *in the future*, if and when he is sent back to the requesting state.

    *Third*, a contrary rule would have perverse and troubling consequences. If this Court's probable cause analysis may be informed by its determination that a fugitive convicted *in absentia* be afforded a new trial in the requesting country, then the Court would have to extend more favorable treatment to a fugitive who wrongfully and illegally fled from the jurisdiction of the requesting state than it would to otherwise similarly situated persons who did not commit that wrong. It cannot be the case that the fugitive should be *rewarded* for his wrongful and illegal conduct.

    *Fourth,* the request is seemingly inconsistent with Nunez's earlier-stated position conceding that the issue of whether he will receive a trial in the Dominican Republic is not an issue for this extradition court.

    In addition, courts have long recognized that the United States should, to the extent practicable, speak with one voice in matters of foreign policy and in the conduct of its foreign relations. Extradition magistrates around the country no doubt have honest and reasonable differences of opinion as to whether and in what circumstances an otherwise lawful and appropriate extradition should be resisted based on essentially humanitarian considerations. As such, an approach that gives the extradition magistrate the authority to impose humanitarian conditions on extradition would inevitably lead to substantial inconsistency in the Nation's conduct of its foreign relations – and would result in similarly situated fugitives being treated differently. Finally, the Secretary of State is manifestly in a better position than this Court to assess the fairness of a foreign sovereign's criminal justice system and to balance this Nation's

treaty obligations and foreign relations interests against its eminently legitimate concern for the future welfare of a person residing (lawfully or not) within our borders.

## VIII. CONCLUSION

For the reasons set forth above, the request for a certificate of extraditability is **GRANTED**.

**IT IS THEREFORE ORDERED** that a certified copy of this Certification of Extraditability and Order of Commitment be forwarded without delay by the Clerk of the Court to the Department of State, to the attention of the Office of the Legal Adviser;

**AND IT IS FURTHER ORDERED** that **Eddy Bismarck Nunez-Garrido** be committed to the custody of the United States Marshal for this District pending final disposition of this matter by the Secretary of State and surrender to designated agents of the Government of the Dominican Republic.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Date:  November 2, 2011